11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

Monty Wayne Lamb

Appellant

Vs.                   No.
11-00-00295-CR  -- Appeal from Dallas
County

State of Texas

Appellee

 

After a
nonjury trial, Monty Wayne Lamb was convicted of capital murder and sentenced
to confinement for life.  We affirm.   

                                                                Background
Facts

During the
afternoon of December 8, 1997, Dallas Police Officer Lesley Miller was sent by
the police dispatcher to investigate a complaint about loud noise from one of
the apartments in a large apartment complex on Skillman Road.  Officer Miller found the bodies of Marla
Speaker,[1]
Laura Page, and Phillip Elliott.   They
had been shot.  A lengthy police
investigation led to the  indictments of
four people:  John Warren Brown,[2]
Ann Marie Wilson,[3]
William Jordan Hardison, and appellant. 
Hardison was the only one of the four who testified during the trial of
this case, and we note that TEX CODE CRIM. PRO. ANN. art. 38.14 (Vernon 1979)
provides that a conviction cannot be had upon the testimony of an accomplice Aunless corroborated by other evidence tending
to connect the defendant with the offense committed.@ 

                                                The Accomplice=s 
Testimony

Hardison
was warned by the court that he had been indicted for the offense of capital
murder; that he was not required to testify; that no one could make him
testify; and that, if he did testify, anything he said could be used against
him in the prosecution of the case against him.  Hardison said that he understood Aall of that@ and
that he wanted to testify.  Hardison=s lawyer was present, and he stated on the
record that he felt like Hardison fully understood what he was doing and that
Hardison was competent to waive his rights and to testify.                   

After the
State called him as a witness, Hardison testified that he was 31 years old and
that he was Acurrently incarcerated@ in the Dallas County Jail.  Hardison testified that he was under
indictment for capital murder in connection with the three people who were
killed on December 8, 1997, and that no one had made any offers or promises of
leniency in exchange for his testimony. 
The State then went through his criminal record with him; Hardison
testified that he had been convicted of: 
(1) burglary in Denton County in 1987; (2) unauthorized use of a motor
vehicle in Dallas County in 1990 or 1991; (3) forgery in Dallas County in 1998;
and (4) forgery in Collin County in 1999. 
Hardison said that he was about 20 or 21 when he went to the
penitentiary the first time and that he joined the Aryan Brotherhood while he
was in the penitentiary.  

Hardison
testified that he met appellant through Brown at Brown=s house. 
Hardison testified that Brown gave him some methamphetamine and that
Hardison injected the methamphetamine with a needle.  Hardison also testified that Brown asked Hardison to hold onto a
gun for Brown.  Hardison said that he stuck
the gun into his coat pocket.  Later
that afternoon, Brown said that he knew somebody that had a Alot of dope.@  Brown asked Hardison about Arobbing them.@  Hardison=s testimony reads in relevant part as shown:

I told him, well, I don=t know, I ain=t never did it before, but yeah, ain=t nobody going to get hurt or nothing, is that why you gave me the
gun?  Maybe somebody is going to get
hurt?  He said, no, man, it=s just for show.  I said, you sure nobody is going to get hurt or nobody is going
to get killed in this because, man, you hear it all the time on the news about
people robbing somebody and they shoot them or somebody gets hurt.  He said like no, man, it=s just all for show.  I need you there because it might be like
three or four people there, and I need you there for show, you know.  

 

                                                           *    *   
*








And he said, no, ain=t nobody going to get hurt.  I said, well, all right.  So, I agreed.  You know, I agreed we were going to go over there and jack these
people for the dope.  Go in there and
get it and leave.

 

Hardison testified that four people left Brown=s house when they went to rob the people who
had the dope: (1) appellant was driving the car; (2) Brown was in the front
passenger seat; (3) Christy was in the backseat; and (4) Hardison was also in
the backseat.  Appellant drove to the
parking lot of the apartment complex where the bodies were found.  Hardison testified that all four of them
went up the stairs to the apartment and that Christy knocked on the door.  When the door was cracked, appellant Abusted on in,@ followed by Brown and Hardison. 
Relevant portions of Hardison=s answers to questions by the assistant district attorney read as
shown:

Q: What happened next
when you got inside?

 

A: We got inside and
[appellant] was yelling at the people to get down on the floor.  The girl [Christy] - - as soon as we got in
the girl went over to the stereo and turned up the stereo, and I was like I had
been up, man, I was on speed, and I was like, man, why have you-all got that
music so loud for.

 

Q: Did it seem very loud
to you?

 

A: Yeah, it was real
loud, you know.  It startled me, you
know. [Appellant] told me to get over there. 
He said get your gun, Will, and hold it on these people, and I was holding
it on these people, and this dude asked me - - he said, man, you-all don=t kill me. 
I said, man, ain=t nobody going to kill you, man, we just want your dope.  We are just going to take your dope.

 

Q: And what was John
Brown and Christy doing?

 

A: Christy was running
around there pulling the cushions up, slinging them around, looking up under
it, trying to look up under the sofas and running through there, and John Brown
was in the back running through there, and he was yelling at Christy, AFind the dope, find the dope,@ and...people was crying and I told them,
man, ain=t nothing to worry about, ain=t nothing going to happen to you, na, we=re just going to take your dope, and be off,
you know...but [appellant] grabbed a=hold of my coat and he pointed a gun to me and told me, Will, you=re going to have to kill these people.  I said, man, I ain=t killing these people, man, I ain=t doing it. 
He said, yeah, Mother F----r, you are or I=m going to kill you and kill them, too.  

 








Hardison testified that
he shot the people and that appellant drove them back to Brown=s house. 
Brown gave him some methamphetamine and told him to forget where Brown
lived and to forget what had happened.  

                                                           The
Trial Court=s
Rulings

After the
court thanked the attorneys for their efforts on the case, the court discussed
matters which had been raised in the final arguments.  The court pointed out that Hardison could not rely on the defense
of Aduress@ when he voluntarily went with appellant and Brown to participate in an
armed robbery.  The court also said that
it was not important whether the people were kneeling or not when they were
shot to death, and the court said that it did not find any credible testimony
to support the defensive theories (that there was an Aryan Brotherhood killing
or a Mexican Mafia killing).  The court
said that the evidence showed that it was a Adope killing.@ 

 The court said that the question was what
part of the testimony was credible and what part of the testimony was not
credible.  The court noted that there
was non-accomplice testimony from three people that appellant had told that he
was involved in the murders.  The court
then mentioned the rule that he, as fact finder, could Abelieve some, all or none of what any witness
says.@  The
court then ruled:

Based on
all the credible evidence and testimony, and the Court has weighed all of this
very carefully over the last two weeks, the Court has held an open mind
throughout all this, the Court finds the Defendant guilty of capital murder as
charged in the indictment.

 

                                                                   Points
of Error

Appellant
presents two points of error.  First, he
argues that the trial court erred in allowing inadmissible hearsay into
evidence over timely objection.  Then,
he argues that the accomplice witness testimony was not sufficiently
corroborated.

                                                             The
Hearsay Objection








Appellant
argues in Point of Error No. 1 that the trial court erred in allowing
inadmissible hearsay into evidence over timely objection.  The record shows that John Alan Betts was
called as a witness by the State, that Betts was Acurrently in the Dallas County Jail,@ and that he had some problems.[4]  Betts testified that there were no offers of
leniency or any Adeals@ or agreements for his testimony. 
Betts identified appellant in open court and said that he had known
appellant as ARocco.@  Betts said that he had known
appellant and Brown through Athe drug business.@  Betts said that he and his
brother had sold drugs.  Before December
8, 1997, appellant and Brown were buying drugs from them.  After December 8,  appellant and Brown sold drugs to Betts and his brother.  Betts testified that Brown and appellant
went Afrom zero to hero, a buyer to seller
overnight.@  

Appellant
objected to testimony by Betts about a conversation which he had with Brown Asometime after December 8th,@ and that Ahearsay@ objection was sustained.  Subsequent portions of the reporter=s record read as shown:

[PROSECUTOR]:  I don=t want to get into what John Brown said.  Let me ask you, what did you say to [appellant]?

 

A:  I asked him what John was so agitated about?

 

[DEFENSE
COUNSEL]:  We=ll object to hearsay again, Your Honor.

 

THE
COURT:  Overruled.

 

A:  I asked [appellant] exactly what John
meant by he killed - - why did [you] have to kill the pretty one?

 

[DEFENSE
COUNSEL]:  Objection, Your Honor.  I mean now what he=s going to do is put it in the form of a
question as to what he asked him and get the same thing in.

 

THE
COURT:  Overruled.

 

Q:  And that=s the question you asked [appellant]?

 

A:  Yes, sir, it is.

 

Q:  Will you tell the Court, what was
[appellant=s]
reaction when you asked him that question?

 








A:  He became highly agitated at John.

 

Q:  What happened?  Was there any conversation between [appellant] and John Brown at
that point?

 

A:  Yeah, they both stood up and began arguing.

 

Q:  Did you understand at that time what the
argument was about?

 

A:  Yeah, judging from what the conversation
that was taking place, yes, John was mentioning again the pretty one, the
barbie doll.

 

[DEFENSE COUNSEL]:  Objection, your Honor.  Same objection.  Hearsay.  And again, Your
Honor, I mean trying to dance around this by putting it in question form or
saying well, [appellant] said this and it=s still trying to get into the same thing and it - -

 

THE COURT:  Well, the Court doesn=t see the objection if the Defendant is
making a statement that may be against his penal interest.

 

                                                           *    *   
*

 

Your objection is overruled....[A] statement
against interest by somebody against their own penal interest is certainly
admissible.  

 

                                                           *    *   
*

 

[PROSECUTOR]:  Mr. Betts, once you asked [appellant] that
question and he began arguing with Mr. Brown, can you describe for the Court
that conversation that took place thereafter?

 

A:  As I was saying, the argument was going back
and forth. [Appellant=s] response to John Brown was, AIf you don=t shut your f-----g mouth, you=re going to be one more.  What=s one more?

 

[DEFENSE COUNSEL]:  Objection, Your Honor.  This is not a question from the witness.

 

THE COURT:  What=s your objection?

 

[DEFENSE COUNSEL]:  That it doesn=t fit the exception.

 








THE COURT:  Overruled. 
(Emphasis added)

 

Betts
also testified that, in mid-December of 1997, he heard appellant say to Walter
Bryan Ashlock in an argument over drugs: AMother F----r, I=ve already got three dead, one more wouldn=t matter.@

Point of Error No. 1 is overruled. 
We agree with the trial court that appellant=s statements were admissible.  Those statements were not Ahearsay.@  See TEX.R.EVID. 801(e)(2)(A)
which specifically provides that an admission by a party is not hearsay.  See, e.g., Trevino v. State, 991 S.W.2d 849,
853 (Tex.Cr.App.1999); Bingham v. State, 987 S.W.2d 54, 56 n.2
(Tex.Cr.App.1999).   The trial court
also announced in open court that it did not find the statement by Brown
to be admissible; consequently, there was no error in overruling the objection
to the question when Betts was asked about appellant=s reaction to Brown=s statement. 

                                  Corroboration
of Accomplice=s
Testimony

The accomplice=s
testimony is not only corroborated by Betts=s testimony which has just been discussed, but it is also corroborated
by testimony from Ashlock, Jonathan Blaine Valentine, and Rhonda Brewer.  We will disregard the statement from Christy
because she was an accomplice.

Ashlock testified that he was Acurrently in TDC on a 25-year sentence@ for possession of a controlled substance.[5]  He also admitted other prior felony
convictions for burglary of a habitation, credit card abuse, theft, and
possession of controlled substances. 
Ashlock testified that he was at Betts=s house one night in December of 1997 when appellant and Brown came over
to sell some dope.  Ashlock said that
that was Avery unusual because normally they were there
to buy dope.@ 
Ashlock identified appellant in open court and said that he had known
him as ARocco.@  Ashlock said that appellant
and Brown were arguing and that he heard appellant tell Brown: A[S]hut the f--k up...it can be one more,
Mother F----r, if you don=t shut the f--k up.@








Valentine
testified that he was Acurrently
incarcerated@ in the Dallas County Jail and that he had
been to the penitentiary twice. 
Valentine testified that no one had made any offers of leniency, deals,
or promises in order to get him to testify. 
Valentine identified appellant in open court and said that he had known
him as ARocco.@  Valentine testified about a
conversation which he had with appellant in January of 1998.  Valentine said that appellant did not Acome right out and tell me he went over and
killed them, but he was bragging about taking care of the Hundred Thousand
Dollar deal.@ 
Other evidence shows that the three deaths on December 8 were connected
to the AHundred Thousand Dollar deal.@

Brewer
testified that she was a Adancer@ and that she had convictions for public
lewdness.  She said that she had used a
lot of different drugs, and she identified appellant in open court.  She said that she had met appellant through
Brown, and she testified that appellant had asked her to be an alibi witness
for him.  She testified that she did not
ever go to a condo with appellant and Brown, but appellant wanted her to testify
that she stayed in the car with him while Brown went up to the condo.

Point of
Error No. 2 is overruled.  The testimony
of the accomplice, Hardison, is corroborated by other non-accomplice evidence
which tends to connect appellant with the murders of Speaker, Page, and
Elliott.  See Cathey v. State, 992
S.W.2d 460, 462 (Tex.Cr.App.1999), cert. den=d, 528 U.S. 1082 (2000).

                                                                This
Court=s Ruling

The
judgment of the trial court is affirmed.

 

BOB
DICKENSON

SENIOR
JUSTICE

March 13, 2003

Do not publish.  See TEX.R.APP.P. 47.2(b).

Panel consists of:  Arnot, C.J., and

McCall, J., and Dickenson, S.J.[6]












[1]Some of the witnesses referred to her as AColleen.@





[2]Brown was tried first, and a jury convicted him of
capital murder.  The State did not seek
the death penalty, and Brown was sentenced to confinement for life. His
conviction was affirmed by the Dallas Court of Appeals.   (See No.05-99-02107-CR, dated August 22,
2001, not published.)  The Court of
Criminal Appeals refused Brown=s petition for
review on May 15, 2002. 





[3]The indictment against Wilson was pending when the case
against appellant was tried, and she exercised her right not to testify.  Some of the witnesses referred to her as AChristy.@





[4]His prior criminal record included a theft conviction
in 1989 and felony convictions for possession of controlled substances in 1995,
1997, and 1999.





[5]A new trial had been granted in that case, and that
case was pending at the time Ashlock testified.





[6]Bob Dickenson, Retired Justice, Court of Appeals, 11th
District of Texas at Eastland sitting by assignment.